Nathaniel MALONE, Jr.,
et al., Plaintiffs,

v.

FAYETTE COUNTY, TENNESSEE,
et al., Defendants.

No. 99–2550 M1/A.

United States District Court,
W.D. Tennessee,
Western Division.

Feb. 15, 2000.

Marc E. Reisman, Jeffrey S. Rosenblum, Rosenblum & Reisman, Memphis, TN, for Plaintiffs.

Larry Killebrew, David Lee Bearman, David L. Bearman, Baker Donelson Bearman & Caldwell, Memphis, TN, for Defendants.

## ORDER DENYING MOTION TO DISMISS STATE CLAIMS

## ORDER GRANTING MOTION TO DISMISS OFFICIAL–CAPACITY CLAIMS

## ORDER DENYING MOTION TO DISMISS FOURTEENTH AMENDMENT CLAIMS

McCALLA, District Judge.

Pending before the Court are two Motions of Defendants: Defendants' Motion to Dismiss State Law Claims and Defendants' Motion For Partial Dismissal of Federal Claims. For the reasons stated below, Defendants' Motion to Dismiss State Law Claims is DENIED. The Court HOLDS that the exercise of supplemental jurisdiction over Plaintiffs' state law claims is appropriate in this case. Defendants' Motion for Partial Dismissal of Federal Claims is GRANTED IN PART AND DENIED IN PART. Defendants' motion to dismiss Plaintiffs' claims against Defendants Kelley and Robinson in their official capacities is GRANTED. Defendants' motion to dismiss Plaintiffs' claims under 42 U.S.C. § 1983 for violation of 14th amendment rights is DENIED.

### I.

Plaintiffs make the following factual allegations, all of which are assumed to be true for purposes of these Motions.[1] On April 25, 1999, at approximately 8:23 p.m., Nathaniel Malone, Sr. ("Decedent"), a

---

1. When deciding a 12(b)(6) a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of [the] claims that would entitle [the plaintiff] to relief." *Cline v. Rogers,* 87 F.3d 176, 179 (6th Cir. 1996).

black male, placed a 911 emergency call to the Fayette County Sheriff's Department because of a domestic violence situation at his home. Defendant Glen Robinson, a deputy sheriff of Fayette County and a white male, responded to Decedent's call unaccompanied by backup officers. Immediately upon arriving at Decedent's home, Robinson instigated a verbal confrontation with Decedent in the front area of Decedent's home. Decedent asked Robinson to leave his home, but Robinson refused. Decedent retreated to the rear area of his home to avoid Robinson, and Robinson followed him.

In the rear area of Decedent's home, Robinson instigated a physical confrontation with the Decedent and began to choke him. Robinson continued to choke Decedent after Decedent was subdued, and until Decedent began to vomit. Robinson beat Decedent in the face with such force as to cause severe soft tissue hemorrhages of his tongue, severe swelling of his eye, severe swelling of his lips, and multiple soft tissue contusions of his head. Robinson continued to choke Decedent with such force that he fractured the cartilage in Decedent's neck and caused submucosal and external tissue hemorrhaging in the neck area. Robinson continued to choke Decedent until he died.

Plaintiffs in this action are Nathaniel Malone, Decedent's son and administrator of his estate, Shameka Malone, Darrick Malone and Jeremy Malone, Decedent's adult children, and Christann Arnett on behalf of Russell, Quchandria, Karin, Taralyn and Chrissa, Decedent's minor children. In addition to suing Fayette County, Plaintiffs sued Robinson and Kelly (who was at that time the Sheriff of Fayette County) in both their individual and official capacities.

Based on the foregoing factual allegations, Plaintiffs have alleged several causes of action. Plaintiffs allege violations of Decedent's Fourth and Fourteenth Amendment civil rights under 42 U.S.C. § 1983 by Defendant Robinson for using excessive force, unlawfully seizing Decedent's person, and violating his liberty without due process of law; against Defendant Kelly for negligently hiring and retaining Robinson and for failing to properly train him; against Fayette County for maintaining various policies and practices which facilitated the events underlying this lawsuit; and against all three Defendants for failing to provide adequate medical care to Decedent after Robinson injured him. Plaintiffs also state a claim under 42 U.S.C. § 1981, alleging that Robinson's actions were racially motivated. Plaintiffs further allege claims under Tennessee common law for negligence and civil conspiracy against all three Defendants. Finally, Plaintiffs allege a claim under Tennessee common law for intentional assault against Robinson.

Defendants deny many of the material allegations set forth above and deny any liability to Plaintiffs as a result of this incident. Defendants' Answer also raises various affirmative defenses.

## II.

Defendants move for dismissal of Plaintiffs' state law claims, arguing that the Court should exercise its discretion to decline supplemental jurisdiction in this case. Defendants argue that the exclusive jurisdiction and venue provisions of the Tennessee Governmental Tort Liability Act ("TGTLA") create sufficient "exceptional circumstances" under 28 U.S.C. § 1367(c) for this Court to decline jurisdiction.[2]

2. Defendants' primarily rely upon two cases: *Beddingfield v. Pulaski,* 666 F.Supp. 1064 (M.D.Tenn.1987) and *Spurlock v. Whitley,* 971 F.Supp. 1166 (M.D.Tenn.1997). *Beddingfield* finds both that the TGTLA strips the federal courts of supplemental jurisdiction over TGTLA claims and, alternatively, that the court would exercise its discretion to decline jurisdiction in that case. *Beddingfield,* 666

F.Supp. at 1066–67. *Spurlock,* relying heavily upon *Beddingfield,* recites *Beddingfield*'s jurisdiction stripping analysis to support the holding that the court should exercise its discretion to decline jurisdiction. *Spurlock,* 971 F.Supp. at 1185. Because the authorities cited by Defendant intertwine the issues of juris-

■ Absent an express waiver of sovereign immunity, states and their political subdivisions enjoy immunity from civil lawsuits filed by individuals. *See Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 2247–48, 144 L.Ed.2d 636 (1999). Tennessee, however, has waived sovereign immunity for particular types of lawsuits by adopting the TGTLA. *See* Tenn.Code Ann. § 29–20–201, et seq. In particular, § 29–20–205 waives immunity for lawsuits to recover for injuries caused by negligent acts or omissions of government employees acting within the scope of their employment, allowing Plaintiffs to plead a cause of action for negligence against Fayette County in this lawsuit.

The TGTLA states, however, that "[t]he Circuit Court shall have exclusive original jurisdiction over any action brought under this chapter and shall hear and decide such suits without the intervention of a jury...." Tenn.Code Ann. § 29–20–307. The TGTLA also provides that proper venue for actions brought under the TGTLA is either "in the county in which such governmental entity is located or in the county in which the incident occurred from which the cause of action arises." Tenn. Code Ann. § 29–20–308.[3] The Act further requires that "[w]hen immunity is removed by this chapter any claim for damages must be brought in strict compliance with the terms of this chapter." Tenn.Code Ann. § 29–20–201(b).[4]

Defendants' jurisdictional argument relies upon these statutory provisions. Defendants do not dispute that Plaintiffs' state and federal claims "derive from a common nucleus of operative fact." *See United Mine Workers of America v. Gibbs,*

383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Instead, Defendants argue that these statutory provisions create an "exceptional circumstance" sufficient for the Court to decline supplemental jurisdiction under 28 U.S.C. § 1367(c).

The first issue raised by Defendants' Motion is whether the exclusivity provisions of the TGTLA preclude the Court from exercising supplemental jurisdiction altogether. It is well established that "no [state] statute limitation of suability can defeat a jurisdiction given by the constitution." *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890). For example, in *Metaljan v. Memphis–Shelby County Airport Authority,* a case also involving the TGTLA, the Court held that the exclusive jurisdiction and venue provisions of the TGTLA did not defeat federal court jurisdiction in that case. *See Metaljan,* 752 F.Supp. 834, 836–37 (W.D.Tenn.1990). Defendants correctly point out, however, that *Metaljan* involved diversity jurisdiction, and that central to the *Metaljan* Court's reasoning was that a state's attempt to strip federal courts of diversity jurisdiction is unconstitutional under the Supremacy Clause of the constitution because Article III allocates diversity jurisdiction to the federal courts. *See Metaljan,* 752 F.Supp. at 837 ("Under the Supremacy Clause, the state does not have the power to override the provisions of the Constitution which provide that federal jurisdiction shall extend to cases between citizens of different states"). Defendants, however, ask the Court to draw a distinction between diversity jurisdiction and supplemental jurisdiction, citing *Beddingfield v. City of Pulaski,* 666 F.Supp. 1064 (M.D.Tenn.1987).[5]

diction stripping and discretion to decline jurisdiction, this Order will address both issues.

**3.** In *O'Neal v. DeKalb County,* 531 S.W.2d 296 (Tenn.1975), the court held that the exclusive venue for TGTLA suits against counties is "the situs of the defendant governmental entity." *id.* at 298.

**4.** This Order expresses no opinion as to whether the TGTLA is an effective waiver of sovereign immunity in cases where the plain-

tiff fails to strictly comply with the exclusive jurisdiction and venue provisions, as required by Tenn.Code Ann. § 29–20–201(b).

**5.** *Beddingfield* refers to supplemental jurisdiction over state law claims as "pendent jurisdiction," its pre-statutory nomenclature. For purposes of consistency, this Order will refer only to "supplemental jurisdiction," the terminology adopted by Congress in 28 U.S.C. § 1367.

For purposes of this Motion, the facts of *Beddingfield* are on point with the case *sub judice*. *Beddingfield* was a civil rights case involving non-diverse parties. The plaintiff alleged a claim under 42 U.S.C. § 1983 over which the Court had federal question jurisdiction. The plaintiff also alleged state law claims pursuant to the TGTLA and urged the court to exercise supplemental jurisdiction. The court refused, however, writing:

> In the instant case, however, there is no separate constitutional basis for federal jurisdictional power notwithstanding the state-law limitation on suability. The basis for federal jurisdiction of diversity or federal-question claims against a Tennessee city or county is a combination of U.S. Const. Article III, section 2, and of the Supremacy Clause, article VI, cl. 2. When the basis for federal jurisdiction is a pendant state-law claim, however, federal power arises from the fact that, considered without regard for their federal or state character, plaintiff's separate claims arise from a common nucleus of operative fact and that "ordinarily" she would be "expected to try them all in one judicial proceeding."

*Beddingfield*, 666 F.Supp. at 1066–67 (citing *Gibbs*, 383 U.S. at 725, 86 S.Ct. 1130 (1966)). Based on this reading of *Gibbs*, the Court concluded that "as a matter of judicial power pendent jurisdiction probably cannot stand in the face of limitations upon suability specified in Tenn.Code Ann. § 29–20–307." *Beddingfield*, 666 F.Supp. at 1067.

Although the *Beddingfield* case is factually similar to the present dispute, the holding in *Beddingfield* is premised upon a misreading of *Gibbs* and a misunderstanding of the source of the Court's supplemental jurisdiction power. The *Beddingfield* court mistakenly assumed that the Supreme Court in *Gibbs* created an extraconstitutional source of judicial power. To the contrary, supplemental jurisdiction is derived directly from Article III, Section 2. In particular, supplemental jurisdiction rests upon the notion of a "constitutional case" as expounded in *Gibbs*. *See Gibbs*, 383 U.S. at 725, 86 S.Ct. 1130 (recognizing that Article III extends the federal judicial power to "cases" and holding that "[supplemental] jurisdiction, in the sense of judicial power, exists whenever there is a claim 'arising under (the) Constitution, the Laws of the United States, and Treatise made, or which shall be made, under their Authority ...' and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' "). In *Gibbs*, the Court held that state and federal claims comprise a single "case" for purposes of Article III, Section 2 when they "derive from a common nucleus of operative fact" and when the plaintiff's claims "are such that he would ordinarily be expected to try them all in one judicial proceeding." *Id.* When Congress subsequently codified the holding in *Gibbs*, Congress similarly defined supplemental jurisdiction by reference to its Constitutional roots. *See* 28 U.S.C. § 1367(a) (authorizing supplemental jurisdiction for "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

■ Because supplemental jurisdiction is derived from the constitution no less so than federal question or diversity jurisdiction, Supremacy Clause interests are also implicated by state statutes attempting to limit the supplemental jurisdiction of federal courts. Just as a state statute may not limit federal court jurisdiction as to federal questions or diversity actions, it may not limit the supplemental jurisdiction conferred by Article III. *See Luning*, 133 U.S. at 531, 10 S.Ct. 363. Accordingly, the Court HOLDS that Plaintiffs' state law claims are within the Court's supplemental jurisdiction, and that the exclusive jurisdiction and venue provisions of the TGTLA do not preclude this Court's jurisdiction.

The second question posed by Defendants' Motion is whether the Court should exercise its discretion to decline

supplemental jurisdiction in this case. The federal supplemental jurisdiction statute defines the circumstances under which a district court may decline to exercise supplemental jurisdiction. It states:

> The district courts may decline to exercise supplemental jurisdiction over any claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of state law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Defendants do not argue for dismissal under § 1367(c)(1)–(3). Defendants argue that the exclusive jurisdiction and venue provisions of the TGTLA constitute "exceptional circumstances" under § 1367(c)(4), and that the Court should decline supplemental jurisdiction for this reason. Defendants cite two cases in support of this position: *Spurlock v. Whitley*, 971 F.Supp. 1166 (M.D.Tenn.1997); and *Beddingfield v. Pulaski*, 666 F.Supp. 1064 (M.D.Tenn.1987) (discussed *supra*).

As previously discussed, *Beddingfield*'s primary holding is that the TGTLA strips the federal courts of supplemental jurisdiction in cases such as these. After reaching this conclusion, however, the *Beddingfield* court stated: "[E]ven if federal jurisdictional power somehow were not foreshortened by section 29–20–307, this Court in this case would decline jurisdiction as a matter of discretion. Its main reasons would be that adjudication of state-law claims might require further explication of the [TGTLA], and that considerations of federalism would require deference be given to the limitation upon suability imposed

by the Tennessee legislature." *Beddingfield*, 666 F.Supp. at 1067.

In *Spurlock*, the court reiterates *Beddingfield*'s reasoning as to jurisdiction stripping (rejected *supra*) to support a different conclusion: that "the exclusivity provision of the TGTLA provides a compelling reason for this Court to decline supplemental jurisdiction of the TGTLA claim in this case." *Spurlock*, 971 F.Supp. at 1185.

■ This Court respectfully declines to follow *Spurlock* and *Beddingfield* on this point. Defendants' Motion is narrow in the sense that non-TGTLA claims comprise the great weight of this lawsuit. Plaintiffs' federal claims clearly predominate over the state law claims. Additionally, Plaintiffs' state law claims against Kelly and Robinson in their individual capacities are non-TGTLA claims. If Defendants' Motion were to succeed, the Court would dismiss only the negligence and civil conspiracy claims against Fayette County.[6] To preserve these claims, Plaintiffs would be forced to initiate a parallel state court proceeding in Fayette County. Such duplicative litigation would be exceedingly wasteful of both judicial and litigant resources. Absent truly exceptional circumstances, the Courts should avoid needless inefficiencies. The exclusivity provisions of TGTLA do not create sufficient exceptional circumstances to warrant dismissal of Plaintiffs' state claims. Defendants' Motion is DENIED.

### III.

Defendants also move to dismiss all claims against Defendants Robinson and Kelly in their official capacities. Defendants argue that these official-capacity claims for monetary damages are redundant because Plaintiffs also sued Fayette County as an entity.

---

**6.** Defendants Motion, if granted, would also dismiss the state law claims against Kelly and Robinson in their official capacities. However, these official-capacity claims are dismissed on other grounds by this Order. *See* Part III, *infra*.

■ The Supreme Court describes official capacity suits in the following manner:

Official-capacity suits ... "generally represent another way of pleading an action against an entity of which an officer is an agent." ... As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.... It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the governmental entity itself.

*Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citations omitted). Thus, "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell* [*v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ], local government units can be sued directly for damages and injunctive or declaratory relief." *Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. 3099.

Because Plaintiffs' official-capacity claims are redundant, they are DISMISSED.

## IV.

Finally, Defendants move to dismiss Plaintiffs' § 1983 claims to the extent that they rely upon the Fourteenth Amendment. Defendants cite *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) for the proposition that when "a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of governmental behavior, that [a]mendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims.' ..." *See* Defendants' Memorandum at 3 (quoting *Graham* ). Defendants assert that, because the Fourth Amendment provides the constitutional standards for evaluating an excessive force claim, Plaintiffs' Fourteenth Amendment due process claims should be dismissed.

■ In *Graham,* the court held that the Fourth Amendment supplies the correct substantive standard for excessive force claims within the context of an arrest or investigatory stop of a free citizen. *See Graham,* 490 U.S. at 395, 109 S.Ct. 1865. *Graham* did not, however, alter the fundamental principal of constitutional law that the restrictions upon governmental power contained in the first eight amendments of the United States Constitution, standing alone, are inapplicable to the states. *See Barron, for Use of Tiernan v. Mayor and City Council of City of Baltimore,* 32 U.S. 243, 246, 7 Pet. 243, 8 L.Ed. 672 (1833). *See also Wolf v. Colorado,* 338 U.S. 25, 26, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). Instead, the protections of the Bill of Rights are applicable to the states only inasmuch as the rights protected in those amendments are "implicit in the concept of ordered liberty" and thus incorporated into the due process guarantees of the Fourteenth Amendment. *See Palko v. Connecticut,* 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

■ Thus, Defendants' argument that the Fourth Amendment provides an "explicit textual source of constitutional protection" is incorrect. The Fourth Amendment restrains the actions of states (and their political subdivisions) only inasmuch as the principles of the Fourth Amendment are incorporated into the Fourteenth Amendment's Due Process clause. *See Wolf,* 338 U.S. at 26, 69 S.Ct. 1359. *Graham* specifies the appropriate substantive standard for evaluating Plaintiffs' § 1983 claim, but does not counsel dismissal of all excessive force claims that rely upon the Fourteenth Amendment. Because Plaintiffs' allegation of excessive force properly

relies upon the Fourteenth Amendment, the Motion to Dismiss is DENIED.